UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LARMARR MAXEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:23-cv-03491-GCS |
| | ) | |
| ALFONSO DAVID, | ) | |
| DANIEL MONTI, | ) | |
| and | ) | |
| RYAN HUGHES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

Pending before the Court are Defendant David's motion for summary judgment. (Doc. 43, 44, 45, 46, 47, 48, 60) and Defendant Monti's and Hughes's motion for summary judgment. (Doc. 54, 55).[1] Plaintiff opposes both motions. (Doc. 58, 66). Based on the reasons delineated below, the Court **DENIES** the motions for summary judgment.

Plaintiff Lamarr Maxey, a former inmate of the Illinois Department of Corrections ("IDOC"), who at the time of his complaint was incarcerated at Shawnee Correctional Center ("Shawnee"), alleges Defendants were deliberately indifferent to his need for hip

---

[1]    Along with the motions for summary judgment, Defendants filed the required Federal Rule of Civil Procedure 56 notice informing Plaintiff of the consequences of failing to respond to the motions for summary judgment and what is required in responding to a motion for summary judgment. (Doc. 49, 56).

surgery in violation of the Eighth Amendment. In his Complaint, Plaintiff alleges he entered the IDOC in January 2013 and shortly thereafter was diagnosed with advanced degenerative joint disease in his left hip. (Doc. 1, p. 13). From March 6, 2013, until December 6, 2017, Plaintiff was housed at Western Illinois Correction Center ("Western Illinois") and received only ibuprofen for his hip pain. *Id*. at p. 13-15. On December 6, 2017, he was transferred to Shawnee and came under the care of Dr. Alfonso David. *Id.* He informed Dr. David on numerous occasions that he still suffered from joint pain and stomach pain from the continued use of ibuprofen during his incarceration at Western Illinois. *Id*. at p. 15. Dr. David informed Plaintiff he would see him every six months for his hip pain, but at every appointment he merely continued with the same course of treatment previously prescribed. Thus, according to Plaintiff, his hip continued to deteriorate, he received only ibuprofen for the pain, and his stomach issues continued to worsen due to the overuse of ibuprofen. *Id*. at p. 16-17.

By 2020, Plaintiff alleges his condition had deteriorated to a point where he was "barely walk[ing] without stumbling." (Doc. 1, p. 16). He informed Dr. David of his condition and requested to see an orthopedic doctor about a hip replacement, but Dr. David told Plaintiff he would have to wait until his release to obtain private insurance. *Id*. On October 23, 2020, Plaintiff fell in the shower due to his hip giving out. *Id*. at p. 17. He wrote a grievance requesting a hip replacement. The grievance response indicated that Dr. David had been consulted, and he informed grievance officials that Plaintiff was not a candidate for hip replacement. *Id*. at p. 5, 7-8, 17.

Plaintiff also alleges that prior to filing a grievance he spoke to his correctional counselor R. Hughes and Warden Daniel Monti about his hip pain. (Doc. 1, p. 18). He informed both he had never received any care other than ibuprofen (which upset his stomach), had never seen an orthopedic surgeon for consultation, and had never received assistive devices such as a cane or walker. *Id*. Both officials deferred to Dr. David's recommendations and stated Plaintiff was being treated by Dr. David. They later denied his grievances. *Id*. at p. 18-19.

On March 14, 2022, Dr. David finally agreed to refer Plaintiff to collegial review for an orthopedic consultation. (Doc. 1, p. 19). On May 5, 2022, Plaintiff saw orthopedic surgeon Roland S. Barr who diagnosed him with a degenerative hip that was "bone on bone." *Id*. Dr. Barr recommended a total hip replacement, despite Dr. David previously stating that Plaintiff was not a candidate for replacement. *Id*. On July 6, 2022, Plaintiff had total hip replacement surgery to repair his hip. *Id*. at p. 19-20.

Upon Plaintiff's return to Shawnee, Dr. David refused to honor the surgeon's order for physical therapy. As a result, Plaintiff alleges his recuperation was delayed due to the lack of physical therapy. (Doc. 1, p. 19-20). He further alleges the delay in referral to an orthopedic doctor caused him pain and caused his condition to deteriorate. *Id*. at p. 20.

On February 2, 2024, the Court conducted a threshold review of Plaintiff's complaint pursuant to 28 U.S.C. § 1915A. Plaintiff was allowed to proceed with an Eighth Amendment deliberate indifference claim against Defendants for delaying his referral to an orthopedic surgeon for hip surgery. (Doc. 11).

Defendant David maintains he is entitled to summary judgment as Plaintiff cannot set forth any evidence that he was deliberately indifferent to Plaintiff's serious medical need. Likewise, Defendants Monti and Hughes maintain they are entitled to summary judgment because they relied on the opinions of the treating medical professionals, and they are entitled to qualified immunity. Plaintiff counters that the evidence shows that Defendants were deliberately indifferent to his serious medical needs. Plaintiff asserts he suffered unnecessary and wanton infliction of pain and suffering due to lack of treatment, and such pain and suffering could have been avoided had he been provided adequate and timely medical treatment.

### UNDISPUTED FACTS

The following facts are taken from the record and presented in the light most favorable to Plaintiff, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

During the relevant times alleged in the complaint, Plaintiff was housed in Shawnee (from December 6, 2017, until he was released on January 2, 2024).

Defendant David is a medical doctor licensed in the state of Illinois. Since 2006, Defendant David has worked as a medical doctor at Shawnee.

Defendant Monti was the Warden at Shawnee from April 1, 2021, to April 5, 2022. As Warden, Defendant Monti's responsibilities included administering and directing the overall operations, programs, and activities of Shawnee. As Warden, Defendant Monti did not have the authority to direct any specific medical care of individuals in custody, nor did he personally evaluate or treat individuals in custody. Defendant Monti did not

Page **4** of **21**

medically evaluate or treat the Plaintiff. He relied on the decisions of trained medical professionals for the medical care of individuals in custody.

Defendant Hughes was a grievance officer at Shawnee intermittently from 2020 to 2024. As a grievance officer, Defendant Hughes's responsibilities included reviewing grievances and, if necessary, conducting a further investigation. As a grievance officer, Defendant Hughes did not have the authority to direct any specific medical care of individuals in custody, nor did he personally evaluate or treat individuals in custody. He did not medically evaluate or treat Plaintiff. Defendant Hughes relied upon the decisions of trained medical professionals for the medical care of individuals in custody.

While at Shawnee Plaintiff saw medical providers for his hip, *i.e.*, two nurse practitioners and Defendant David.

Plaintiff saw Defendant David on December 7, 2017, after he arrived at Shawnee. On December 27, 2017, Defendant David reviewed Plaintiff's chart and renewed his low bunk permit for six months.

On January 24, 2018, Plaintiff saw Nurse Practitioner ("NP") Tammy Pittayahikhan for left hip pain. The NP charted that Plaintiff exercised daily. She noted Plaintiff had a steady and stable gait, crepitus, and full range of motion of the left hip although less than the right hip. She noted a December 2014 x-ray that showed advanced osteoarthritis of the left hip with complete loss of joint space. She prescribed Naproxen 500 mg for eight months and muscle rub for eight months. She also placed Plaintiff in the chronic clinic for advanced left hip osteoarthritis.

Plaintiff again saw NP Pittayahikhan in the chronic clinic for left hip pain on May 17, 2018. She observed an antalgic gait and decreased motion in the left hip. She discontinued Naproxen and started Mobic for eight months; she also ordered an x-ray of the left hip. About a month later, Plaintiff saw NP Pittayahikhan for the x-ray follow-up. She noted that Plaintiff reported that Mobic, Naproxen, ibuprofen, and Tylenol were not helpful. She further noted the x-ray showed moderate to severe osteoarthritis of the left hip joint. She discontinued Mobic, prescribed Indocin 25 mg for three months, issued a low bunk permit for one year, and ordered a follow-up in a month.

On July 12, 2018, NP Pittayahikhan saw Plaintiff for left hip pain. Plaintiff reported he did not notice any difference in pain with Indocin. She noted Plaintiff exercises and does not "want to be doped up" and left hip "just doesn't work like the right." She discontinued the Indocin, prescribed muscle rub for eight months, and referred the matter to Defendant David for advanced osteoarthritis of the left hip.

Five days later, on July 17, 2018, Plaintiff saw Defendant David in sick call for his left hip pain. The physical exam was unremarkable. Defendant David's assessment was osteoarthritis/degenerative joint disease left hip. Defendant David told Plaintiff to perform range of motion exercises for his left hip as tolerated. He prescribed Plaintiff Mobic for one month.

On August 31, 2018, Plaintiff saw NP Pittayahikhan. She reported no change with Mobic, Indocin, Naproxen or Tylenol. She started Plaintiff on Tramadol 50 mg for two months, started Calcium with Vitamin D for eight months, and ordered a follow-up. Plaintiff followed up with NP Pittayahikhan on October 5, 2018. Plaintiff reported

Tramadol was helping, but he felt itchy and constipated when taking it. She assessed Plaintiff with severe osteoarthritis of the left hip. She prescribed Colace for eight months, ibuprofen 600 mg for three months, Tramadol 50 mg for three months, and ordered a follow-up in the chronic clinic.

On November 26, 2018, Plaintiff treated with Defendant David in the chronic clinic for left hip osteoarthritis. Plaintiff reported to Defendant David that his left hip was doing well, and he had been doing exercises and running. Defendant David advised Plaintiff to stop if he had pain. He also noted the physical exam was unremarkable with normal gait and no tenderness of the left hip. Defendant David discontinued Tramadol and prescribed Mortin for three months.

On April 2, 2019, NP Pittayahikhan renewed Plaintiff's prescription for muscle rub for eight months. Two weeks later, Defendant David saw Plaintiff for an annual exam.

Around the end of May 2019, NP Pittayahikhan treated Plaintiff in the chronic clinic for left hip osteoarthritis. Plaintiff reported he was doing okay, he had no falls, and he did not want a supportive device. He did note, however, that his left hip catches at times. She diagnosed osteoarthritis of left hip "good/stable." She prescribed Calcium with Vitamin D and ibuprofen 600 mg for eight months. She also issued a low bunk permit for a year and a complete, comprehensive metabolic panel before the next chronic clinic.

NP Pittayahikhan reviewed Plaintiff's chart on July 12, 2019, and prescribed a low bunk permit indefinitely. She reviewed his chart again on August 5, 2019, and prescribed a low bunk and low gallery permits indefinitely.

Plaintiff saw NP Pittayahikhan on October 4, 2019, wherein he complained of new numbness in the left hip. She also noted Plaintiff complained of throbbing and numbness with his left hip and leg for three weeks. She prescribed Medrol Dosepak and ordered a follow-up. A week later, Plaintiff had his follow-up with NP Pittayahikhan. Plaintiff reported that his left hip and leg had constant numbness and tingling. Plaintiff also reported that his left leg will give out, but ibuprofen does help to a degree. She observed a steady gait with occasional limping. She prescribed Cymbalta 30 mg for eight months, muscle rub for three months, and ordered Plaintiff to follow-up for a medication check.

On December 18, 2019, Plaintiff saw Dr. Vipin Shah in the chronic clinic for complaints of left hip osteoarthritis. Dr. Shah found Plaintiff's condition as "fair, stable." He prescribed Cymbalta and ibuprofen for six months.

A month later, Defendant David, after being contacted via telephone by a nurse, gave an oral order to renew Plaintiff's prescription for Calcium with Vitamin D for eight months.

In March of 2020, the World Health Care Organization declared Coronavirus disease 2019 ("COVID- 19) a pandemic. During the pandemic, hospitals and ambulatory surgical treatment centers postponed performing non-emergency surgeries and procedures. Also, during the pandemic, certain conditions had to be met to proceed with elective procedures after hospitals and surgery centers resumed performing such procedures.

Plaintiff testified that during the pandemic prisoners were on "23 and one" lockdown for 1.5 to 2.5 years. Plaintiff also testified he does not know if an orthopedist

would have performed an elective surgery on him in 2020. Plaintiff was to be seen in the chronic clinic on May 12, 2020, for left hip osteoarthritis. However, he was not seen due to the COVID-19 directives. Instead, Defendant David gave an oral order to renew Plaintiff's prescriptions for Cymbalta and Calcium with Vitamin D for one year.

From June 10, 2020, to September 10, 2020, Plaintiff saw Nurse Practitioner Mary Peaks for his left hip on three occasions. During these visits, Plaintiff reported Cymbalta was not effective and Pamelor was not working. Plaintiff also wanted to discontinue ibuprofen. She noted Plaintiff was able to perform all activities of daily living, and his range of motion was within normal limits. She reassessed and readjusted his medications based on his complaints during these visits.

On November 10, 2020, Defendant David treated Plaintiff in the chronic clinic for left hip osteoarthritis. Defendant David noted "unremarkable gait with ambulation normal." Defendant David's diagnosis was degenerative joint disease lumbar, hip with neuropathy, fair and stable. Defendant David prescribed Motrin 600 mg for one month, Cymbalta for six months, and an x-ray of Plaintiff's bilateral hips.

Plaintiff had the x-ray of his hips on November 12, 2020. The x-ray revealed "bilateral osteoarthritis of the hip joints, most pronounced on the left similar to the prior study" and "[t]here [was] no acute bony fracture or dislocation."

From February 2, 2021, to April 8, 2021, Defendant David treated Plaintiff for a possible chest malignancy and throat mass. He ordered labs and x-rays and submitted a collegial review request for Plaintiff to have a CT of his neck. Plaintiff had a CT on February 22, 2021, which revealed a multinodular goiter and an ultrasound correlation

was recommended; nonspecific right upper lode nodules and mediastinal lymphadenopathy, incomplete imaged; and mild emphysema. A dedicated contrast enhanced CT was recommended. On February 24, 2021, Defendant David submitted a collegial review request for Plaintiff to have an ultrasound of his neck and a chest CT scan. The impression of the chest CT revealed: 1. Mediastinal and hilar lymphadenopathy which could be malignant; 2. Small nodular focus in the right upper lobe could be benign or malignant; and 3. Grossly enlarged nodular thyroid gland. On March 23, 2021, Defendant David submitted a request for collegial review for pulmonary and endocrinology consultations. Plaintiff was approved for an appointment with endocrinology on March 30, 2021. On April 7, 2021, Plaintiff saw Dr. Gurpeet Bambra, a pulmonologist. Further, on April 8, 2021, Defendant David submitted a collegial request for Plaintiff to see Dr. Prateek Srinet, an ENT, to evaluate his thyroid mass.

At 1:30 p.m. on May 17, 2021, Plaintiff saw Defendant David in the chronic clinic for left hip osteoarthritis. Defendant David observed Plaintiff walking without assistance. He prescribed Cymbalta for eight months, Motrin for two months, and Calcium with Vitamin D for eight months.

On July 23, 2021, Defendant Hughes reviewed Plaintiff's grievance #2020-11-03, in which Plaintiff complained his left hip gave out, he fell and hit his head, he had degenerative joint disease, and he was in excruciating pain. Defendant Hughes recommended Plaintiff's grievance be denied because Defendant David had indicated Plaintiff was not a candidate for hip replacement surgery, was treated medically, and was seen regularly in the chronic clinic. That same day, after reviewing the grievance officer's

recommendation that the grievance be denied, Defendant Monti concurred in the recommendation.

In the meantime, from June 8, 2021, to  September 29, 2021, Defendant David treated Plaintiff for complaints of the throat mass and pulmonary issues. Plaintiff had a pulmonary functioning test at SIH Memorial Hospital in Carbondale on June 14, 2021. On August 5, 2021, Defendant David submitted a collegial review request for Plaintiff to follow-up with Dr. Bambra for his pulmonary functioning test. On September 3, 2021, Plaintiff had a CT of his chest. Defendant David requested a thyroid biopsy to diagnose or rule out thyroid cancer or metastasis.

On October 5, 2021, Plaintiff again saw Defendant David in sick call for left hip pain. During this encounter, Plaintiff expressed his left hip was hurting more, the Motrin was no longer effective, and he did not want Cymbalta anymore. Defendant David reviewed Plaintiff's November 20, 2020, bilateral hip x-ray showing osteoarthritis similar to the prior study. On physical exam, Plaintiff ambulated normally, but he reported sometimes he was not able to maintain balance in the showers or when he had shooting pain. Defendant David discontinued Motrin and Cymbalta and started Plaintiff on Voltaren 75 mg for three months and Pamelor for three months.

Plaintiff saw Defendant David in chronic clinic for left hip osteoarthritis on December 15, 2021. During this visit, Plaintiff reported increased left hip pain. He also requested an increase in his pain medications. Defendant David also advised Plaintiff he was approved for an ultrasound guided throat biopsy with a follow-up with the ENT and pulmonologist. Plaintiff reported that Voltaren was not working. Defendant David's

physical exam of Plaintiff did not change. His diagnosis was osteoarthritis degenerative joint disease "fair stable;" Sarcoidosis "good-stable;" and Goiter – nodule. He scheduled the nodule for biopsy. He continued Plaintiff on Voltaren 75 mg, Pamelor 25 mg, and Calcium with Vitamin D. He also ordered a bilateral hip x-ray.

On February 24, 2022, Plaintiff had the ultrasound guided thyroid nodule biopsy.

On March 3, 2022, Defendant David requested the results of the nodule biopsy.

On March 14, 2022, Plaintiff saw Defendant David in sick call for his left hip. Plaintiff complained of the following:  severe left hip pain, NSAIDS and Cymbalta were not working anymore, and occasionally his left lower extremity gives out due to pain. Defendant David's exam was unremarkable except for nodular thyroid. The results of the nodule biopsy were benign. However, Plaintiff's December 23, 2021, x-ray showed advanced osteoarthritis of the left hip with subchondral sclerosis with remodeling of the acetabulum. Defendant David's diagnosis was nodular goiter, sarcoidosis, and severe osteoarthritis of the left hip. Defendant David's plan was Ultram (tramadol) for eight months and a referral to orthopedics. That same day, Defendant David submitted a collegial review request for Plaintiff to be referred to orthopedics for left hip and neuropathy.

On May 5, 2022, Plaintiff saw Physician Assistant Gretchen Mason at The Orthopedic Institute of Southern Illinois. PA Mason discussed both surgical and nonsurgical options, and Plaintiff said he was ready to proceed with a total left hip arthroplasty. On July 6, 2022, Plaintiff had a left primary total hip replacement performed by Dr. Roland Barr at SIH Herrin Hospital in Herrin, Illinois.

Plaintiff alleges he spoke with Defendant Hughes about the treatment he was receiving for his hip after he learned Defendant Hughes was the one investigating the grievance Plaintiff filed. Plaintiff alleges he spoke with Defendant Hughes at least two times. He told Defendant Hughes that the only thing the medical providers wanted to give him was a low bunk permit. He further noted he was on the chronic list and the only thing Defendant David would give him was ibuprofen. He also noted that he had not yet seen an orthopedic. He further alleges, over the course of multiple interactions with Defendant Hughes, that he would ask Defendant Hughes if he was going to decide the grievance.

Plaintiff alleges he spoke with Defendant Monti about three times regarding his hip. Plaintiff further alleges that every time he talked to Defendant Monti, he was trying to get him to intervene regarding the treatment he was receiving from Defendant David.

LEGAL STANDARDS

A.    Summary Judgment Standard

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 567 (7th Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The Court must consider the entire record, drawing reasonable inferences and resolving

Page **13** of **21**

factual disputes in favor of the non-movant. *See Fletcher v. Doig,* 145 F.4th 756, 764 (7th

Cir. 2025) (citing *Anderson*, 477 U.S. at 255). *See also Bishop v. Air Line Pilots Ass'n Int'l,* 5

F.4th 684, 693 (7th Cir. 2021) (stating that "we are not required to draw every conceivable

inference from the record . . . but 'only those inferences that are reasonable.'") (internal

citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a

showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court

may not "weigh evidence or engage in factfinding[,]" it must determine if a genuine issue

remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply

rest on the allegations in his pleadings; rather, he must show through specific evidence

that an issue of fact remains on matters for which he bears the burden of proof at trial.

*See Knight v. Wiseman,* 590 F.3d 458, 463 (7th Cir. 2009); *Abrego v. Wilkie*, 907 F.3d 1004,

1012 (7th Cir. 2018). No issue remains for trial "unless there is sufficient evidence favoring

the non-moving party for a jury to return a verdict for that party . . . if the evidence is

merely colorable, or is not sufficiently probative, summary judgment may be granted."

*Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Smith v. City of Janesville,* 40 F.4th

816, 821 (7th Cir. 2022); *Doxtator v. O'Brien,* 39 F.4th 852, 860 (7th Cir. 2022). In other

words, "inferences relying on mere speculation or conjecture will not suffice." *DiPerna v.*

*Chicago School of Professional Psychology,* 893 F.3d 1001, 1006 (7th Cir. 2018) (internal

citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of

a scintilla of evidence in support of the [non-movant's] position will be insufficient; there

must be evidence on which the jury could reasonably find for the [non-movant]").

Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal citation omitted).

**B.     Deliberate Indifference**

The Eighth Amendment prohibits cruel and unusual punishments, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457-458 (7th Cir. 2020) (citations omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (citation omitted).

To prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (citations omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Johnson*, 5 F.4th at 824. *Accord Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025) (citations omitted). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019) (citations omitted). It

is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm") (internal quotation marks omitted).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Johnson*, 5 F.4th at 824. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) (citations omitted). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Lockett*, 937 F.3d at 1023. *See also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) (stating that "isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Eagan v. Dempsey*, 987 F.3d 667, 688 (7th Cir. 2021) (citations omitted). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (citations omitted).  A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Non-medical prison staff, meanwhile, are generally "entitled to relegate to the prison's medical staff the provision of good medical care[.]" *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Thus, non-medical prison staff may be held liable under § 1983 only if they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). The relevant inquiry turns on the prison official's subjective state of mind. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc).

## DISCUSSION

For the purposes of this motion and based on the record before the Court, the Court finds that Plaintiff's left hip condition constitutes an objectively serious medical need.  Further, based on that same record and construing the evidence in the light most

favorable to Plaintiff, the Court finds there is sufficient evidence for Plaintiff's claims to withstand summary judgment.

First, Defendant David argues Plaintiff cannot establish he exhibited deliberate indifference to Plaintiff's serious medical need. Specifically, Defendant David argues he and the other medical providers provided Plaintiff with continuous care and a course of treatment that changed over time. This included strengthening and flexibility exercises, the issuance of low bunk and low gallery permits, x-rays, analgesic balm, Calcium with Vitamin D supplements, corticosteroids, a variety of pain medications, and ultimately surgery.

Here, the record reveals that Plaintiff suffered from advanced degenerative osteoarthritis of the left hip since 2014. Further, the record reveals that Plaintiff entered IDOC in 2013 with advanced degenerative joint disease. At the time he arrived at Shawnee at the end of 2017, he had already been diagnosed with "complete loss of joint space" in the left hip. This condition was repeatedly documented by medical staff throughout the years, and Plaintiff ultimately had total hip replacement in July 2022 after the orthopedic surgeon found Plaintiff's hip to be "bone on bone."

Between January 24, 2018, and March 14, 2022, Plaintiff saw medical providers at Shawnee for his left hip twenty times, including Defendant David seven times. Plaintiff asked for an orthopedic specialist in 2018. Further, the medical records reveal that for years Plaintiff reported severe pain, numbness, instability, and falls. His medical records also reveal that Plaintiff constantly complained that Mobic, Indocin, Naproxen, Tylenol, Cymbalta, and Pamelor were not working. Specifically, the medical reports notes the

medications "were not helpful," the left hip "just doesn't work like the right," and the leg "will give out." Despite these complaints, Defendant David continued with the path of conservative treatment for more than four years before referring Plaintiff to an orthopedic specialist in March 2022.

Defendant David maintains the conservative treatment was proper as Plaintiff had a steady gait and performed daily activities. He also had a job and participated in recreation. However, the record also reveals that Plaintiff reported falls, instability, worsening pain coupled with numbness and tingling, and a huge decline starting in 2019 and continuing thereafter. By 2020, Plaintiff reported he could "barely walk without stumbling." *See, e.g.*, *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (noting that a delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain). Plaintiff also testified that Defendant David told him he was not old enough for a hip replacement, and he should wait until he is sixty. This could suggest that the delay for the surgeon referral was not based on the medical issues at that time.

Defendant David argues that the record reveals he was not deliberately indifferent because he made collegial referrals regarding Plaintiff's cancer scare with respect to Plaintiff's throat mass and pulmonary issues. The Court, however, finds these referrals are irrelevant to the analysis of Plaintiff's hip treatment claim. A doctor's reasonable treatment of one serious condition does not immunize him from liability for ignoring another serious medical condition. The question before the Court is whether Defendant

David responded appropriately to Plaintiff's hip condition. Based on these disputes in the record, the Court finds that summary judgment is not appropriate.

Next, Defendants Monti and Hughes argue they are entitled to summary judgment as they relied upon the opinions of the treating medical professionals. Plaintiff counters that there are disputes of fact as to whether Defendants Monti and Hughes knowingly disregarded his serious medical needs by repeatedly "rubber-stamping" Defendant David's constitutionally deficient care.

Here, the record contains evidence that Plaintiff directly told both of these Defendants about his left hip issues before he filed grievances. Specifically, Plaintiff told Defendant Hughes at least twice he was only given ibuprofen for the pain; he had not seen an orthopedic surgeon; and his hip was giving out and causing him to fall. Additionally, Plaintiff told Defendant Monti at least three times he was in severe pain and he needed medical intervention because Defendant David was not addressing his hip issue. Defendants dispute Plaintiff's version of events in their declarations. Thus, there is a factual dispute about what knowledge these Defendants may have had or did not have about Plaintiff's serious medical condition. Further, there are disputes as to whether their reliance on Defendant David's care was reasonable and whether the delay in the orthopedic referral constituted deliberate indifference. Plaintiff's repeated complaints to these Defendants could establish they had a reason to believe the medical

care was inadequate, and despite this knowledge they still did nothing to help Plaintiff. Thus, these disputes must be decided by a jury and not at the summary judgment stage.

Lastly, Defendants Monti and Hughes argue that they are entitled to summary judgment because qualified immunity protects them from liability. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017). The test for qualified immunity has two prongs: (1) whether the facts, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Plaintiff's Eighth Amendment rights were clearly established at the time of Defendants' alleged misconduct and whether Defendants Monti and Hughes violated Plaintiff's rights is disputed at this point in the litigation. Thus, Defendants are not entitled to summary judgment based on qualified immunity.

### CONCLUSION

Accordingly, the Court **DENIES** Defendants' motions for summary judgment (Doc. 43, 54). The Court **DIRECTS** the Clerk of the Court to set this matter for status conference to discuss potential trial dates. Further, the parties shall contact the undersigned's chambers if they feel a settlement conference would be beneficial.

**IT IS SO ORDERED**.

**DATED: March 27, 2026.**

Gilbert C Sison

Digitally signed by Gilbert C Sison
Date: 2026.03.27
07:39:50 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**

Page **21** of **21**